## ST. LOUIS AND THE KANSAS CITY

# COURTS OF APPEALS

AT THE

## OCTOBER TERM, 1897.

---

(*Continued from Volume 72.*)

---

GROVES MABRAY *et al.*, Appellants, v. THE KELLY-GOODFELLOW SHOE COMPANY, Respondent.

St. Louis Court of Appeals, January 4, 1898.

| | |
|---|---|
| 73 | 1 |
| 77 | 153 |
| 73 | 1 |
| 81 | 418 |
| 73 | 1 |
| 87 | 601 |

**Principal and Agent:** LIABILITY OF PRINCIPAL FOR CONTRACTS OF SALE BY AGENT: GENERAL USAGE: OPTION OF PRINCIPAL TO REJECT SALES. An agent employed to solicit orders for goods must be deemed, as to innocent third persons dealing with him, to have authority to make contracts binding on his principal, where that is the general usage in the business as conducted by such dealers with their customers, especially where like sales made by the agent have been recognized by his employer; and an option reserved by the principal of rejecting all sales by his agent, where the commercial standing of the persons dealing with him is unsatisfactory to the principal, is ineffectual and of no avail, unless exercised, and within a reasonable time.

*Appeal from the St. Louis City Circuit Court.*—HON. D. D. FISHER, Judge.

REVERSED (*with directions*); Judge BOND concurring, Judge BIGGS dissenting.

VOL. 73 app—1 (1)

*Farish & Williams* for appellants.

*Collins & Jamison* for respondent.

It is immaterial in this case as to what was the custom in Texas, as to the authority of traveling salesmen to bind their employers in a contract to sell goods. The contract was to have been executed in St. Louis, and the law of the place of performance of the contract is the law to govern in this case. *Kerwin v. Doran*, 29 Mo. App. 397; *Finch v. Mansfield*, 97 Mass. 89.

Price could not have made an absolute sale, nor a binding contract to sell, as he did not have the goods in his possession. *McKinley v. Dunham*, 55 Wis. 518; *Strachen v. Muxlow*, 24 *Id.* 1.

"Parties, in dealing with an assumed agent, should be careful to see and be assured that he is the agent he represents himself to be, and that he is acting within the scope of his authority." *Reynolds v. Ferree*, 86 Ill. 570; 1 Am. and Eng. Ency. Law, 351, 352, and citations; *Konerman v. Monahan*, 24 Mich. 36.

"The power to sell does not imply the power to sell on any other terms than for cash; and if the power to sell on credit be given, the credit must be a reasonable one." Tied. on Sales, sec. 269; *Flanagan v. Alexander*, 50 Mo. 51; *Wheeler v. Givan*, 65 *Id.* 89; *Burks v. Hubbard*, 69 Ala. 379; *Scoby v. Wood*, 59 Tenn. 66.

The fact being known to appellants that Price was a commercial traveler, it was notice to them that he was an agent of limited authority; that he only had authority to solicit orders for goods and submit them to his principal for approval or rejection, and that he had no authority to make a binding sale, or agreement to sell the goods. *Bensberg v. Harris*, 46 Mo. App. 404; 3 Am. and Eng. Ency. Law, 315; *City of Kansas v. Collins*, 34 Kan. 434; *State v. Miller*, 93 N. C. 511;

*Singleton v. Fritsch*, 4 Lea (Tenn.), 93; *Comm. v. Farnum*, 114 Mass. 267; *McKinley v. Dunham, supra; Abraham v. Dunham*, 87 Ill. 179; *Reynolds v. Ferree, supra; Konerman v. Monahan, supra*.

Reply brief (original brief for appellant not furnished).

Where a custom is found to be general and notorious in the locality where the parties are conducting their negotiations it is a conclusion of law that the parties must have contracted with reference to it, and their knowledge of such custom is conclusively presumed. *Clayton v. Gregner*, 5 A. & El. 202.

As it is the custom which makes it a part of the contract, it is necessary to prove such custom, and when proven, the courts of this state will, in interpreting such contract, declare what force and effect such custom has. *Long Bros. v. Armsby Co.*, 43 Mo. App. ——, citing Jones on Con. Com. and Tr., sec. 61; 1 Greenlf. Ev. [14 Ed.], sec. 292; *Field v. Lateau*, 6 Hort and Noru. 17; *Nelson v. Ins. Co.*, 71 N. Y. 453; *Kimball v. Brawner*, 47 Mo. App. 400.

BLAND, P. J.—In May, 1895, Perry, Oldham & Company were merchants doing business at McKinney, Texas, and the firm of Mabray, Oldham & Company were doing a mercantile business at Bonham, Texas. In that month Thomas S. Price was a traveling salesman for the Kelly-Goodfellow Shoe Company in that part of the state of Texas embracing McKinney and Bonham, and on the fifteenth day of May, 1895, he called upon Mabray, a member of both firms, at his place of business at Bonham, with ten or fifteen samples of shoes, with a view of selling the firm shoes for Kelly-Goodfellow Shoe Company; Mabray selected a shoe marked "Korker" from his samples, and bought

Mabray v. Kelly-Goodfellow Shoe Co.

or gave Price an order for ten cases for the Bonham store, and ten other cases (same shoe) for the McKinney store; Price executed and delivered to him the following bills of sale:

"BONHAM, TEX., May 15, 1895.

"Sold to Perry, Oldham & Co.,
Nov. 1, McKinney, Texas.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 217 | 12 | Mens Bf. Bals. | | 6-10 | | | 1.00 |
| 215 | 12 | " | " | " | 6-10 | | 1.00 |
| 216 | 36 | " | " | Cong. | 6-10 | 6-11 | 1.00 |
| 218 | 60 | " | " | " | 6-10 | 6-11 | 1.00 |

"KELLY-GOODFELLOW SHOE CO.
"THOMAS S. PRICE."

"BONHAM, TEX., May 15, 1895.

"Sold to Mabray, Oldham & Co.,
Nov. 1, Bonham, Texas.

| | | | | | | |
|---|---|---|---|---|---|---|
| 217 | Mens Bf. Bals | | 6-10 | | | 1.00 |
| 215 | " | " | " | 6-10 | | 1.00 |
| 216 | " | " | Cong. | 6-10 | 6-11 | 1.00 |
| 218 | " | " | " | 6-10 | 6-11 | 1.00 |

"KELLY-GOODFELLOW SHOE CO.,
"THOMAS S. PRICE."

On August 9, 1895, the bill of sale executed to Perry, Oldham & Company was by that firm assigned in writing to the firm of Mabray, Oldham & Company. Duplicates of these bills of sale were forwarded to Kelly-Goodfellow Shoe Company at their place of business, so as to inform them of the sale or order, and to enable them to ship the goods. The terms of sale were that the goods should be shipped by June 10, and paid for on November 1, 1895. The Kelly-Goodfellow Shoe Company repudiated the order or bills of sale, but offered to fill the bills at $1.10 per pair. This offer the plaintiffs declined to accept, and brought suit for damages alleged to have accrued on account of the failure to comply with its alleged contracts made by Price. The defense relied on was that Price had no authority to make an absolute sale, and that the extent of his authority was to solicit trade and take orders for

defendant's goods, which orders were filled or not at
the option of defendant.  At the close of plaintiffs'
evidence the court instructed the jury that under the
pleadings and evidence the plaintiffs could not recover.
Plaintiffs took nonsuit with leave to move to set same
aside; their motion to set aside nonsuit was overruled,
and they appealed to this court.

A. S. Gaines testified that he was acquainted with
the custom of the St. Louis wholesale dealers, regard-
ing the authority of their traveling salesmen in selling
goods to the retail trade in Bonham, Texas; that these
salesmen have authority to bind their employers as for
prices of goods, but not as to credit or the commercial
standing of the firm buying the goods; that he was a
dealer and had made orders or purchases through Price
of the defendant, all of which had been filled, and that
he had made a purchase of the defendant in 1895,
through their salesman Price.  D. M. Bates testified
that he was a traveling salesman selling boots, shoes, and
other goods for about seven years for St. Louis whole-
sale houses, and that when he was not otherwise
specially instructed he had authority to fix the price
and time of payment of the goods sold by him, and
that in his experience no house he represented had
ever refused to ship the goods he had sold when the
credit of the buyer was good; that he knew Thomas S.
Price, and that he was a traveling salesman in Texas
for Kelly-Goodfellow Shoe Company.  Groves Mabray,
one of the plaintiffs, testified that for the previous two
years he had bought boots and shoes from defendant
through Thomas S. Price, who had been their travel-
ing salesman for two years previous to making the
sales to him; that neither Price nor the defendant
informed him prior to May 15, 1895, that Price's
authority was limited to take orders and submit them
to defendant; that the goods he had bought from Price

on former occasions had always been shipped by the defendant.   Hope Carleton testified that he was a traveling salesman, and that he was acquainted with the custom of the wholesale merchants of St. Louis selling goods in Texas; that when the buyer is financially responsible, it is the custom for the wholesale merchant to ship the goods; that when a traveling salesman sends an order from the retail dealer, it is not subject to approval or rejection on account of terms or prices or both being unsatisfactory to the house; that such orders are straight sales, subject to the right of the house to reject on account of the unsatisfactory financial standing of the buyer.   F. M. Thompson, a retail hardware dealer at Bonham, Texas, testified that his house bought most of their goods in St. Louis; that he bought from both traveling salesmen for wholesale houses and from the houses direct; that the custom of the wholesale houses in St. Louis as to their Texas trade was to comply with the salesman's prices and terms.   John D. Donaldson, a traveling salesman in Texas for the Goodbar Shoe Company of St. Louis, testified that in selling goods the salesman fixed the price, and that it is the custom of traveling salesmen to shave the prices when necessary to get trade, and that it is the custom of the house to ship the goods even if sold below the list price, provided the commercial standing of the purchaser is satisfactory.   Luke Cates, another traveling salesman in the state of Texas, testified that it was the custom of Price and other salesmen to sell goods below the list price; that salesmen used their discretion in fixing the price, and he knew no reason for a house refusing to fill the orders of its traveling salesmen, except that the commercial standing of the buyer was not satisfactory.   The following letter was read in evidence:

"ST. LOUIS, May 20, 1895.

"*Messrs. Perry, Oldham & Co., McKinney, Texas.*

"DEAR SIRS:—We regret that we can not accept your order for ten cases men's Korker Bals. and Cong. to be shipped June 10th and payable November 1st at $1 per pair—the very best that we could take this order at to-day, is $1.10 per pair with the bill payable October 1st, and we can not hold this price open longer than time enough to receive your reply. If you wish us to book the order at $1.10 payable October 1st, will you kindly wire us at our expense on receipt of this letter. We have only a limited supply of these goods and when we have sold out what we now have contracted for, will have to still further advance the price. Awaiting reply, we are,

"Yours truly,

"KELLY-GOODFELLOW SHOE CO.,

"PER CHAS. H. HOKE, Sec'y."

A like letter of the same date was addressed to Mabray, Oldham & Company, at Bonham. These letters were answered by a telegram, stating that the purchasers expected the goods at prices and terms at which they were bought, and also by letter to the same effect. On May 27, Kelly-Goodfellow Shoe Company again wrote the plaintiffs that they could not ship the goods at the prices fixed by Price, and that the shoes were then worth $1.25 per pair wholesale. In answer to this letter plaintiffs, on May 29, addressed the following letter to defendant:

"BONHAM, TEX., May 29th, 1895.

"*Messrs. Kelly-Goodfellow Shoe Co., St. Louis, Mo.*

"DEAR SIRS:—Yours of May 27th, 1895, to hand. In reply we must say that we are surprised beyond measure at its contents.

"Coming from business men as you are makes it more surprising. Suppose some legal representative

of some eastern factory should call at your place of business and sell you 100 cases of shoes at a price, give you a copy of the order properly signed, dated, etc., would you not hold them to it? Most assuredly you would. I bought the goods in good faith from your Mr. Price, and he sold them to me in good faith. Mr. Price does not claim any mistake in the price, terms, etc., and you admit in yours of May 20th that you have the goods and refuse to ship them on the terms of your legal representative. The order was not given on conditions of any kind, neither was given subject to your approval, but was a straight out sale. Place yourself in my position, and you will readily see the injustice you are trying to do us. We must reaffirm our telegram and letter of twenty-fourth and insist on you shipping goods according to terms, prices, etc., as we bought them.

"Yours truly,

"MABRAY, OLDHAM & Co."

On May 30 the defendants wrote plaintiffs as follows:

"ST. LOUIS, May 30th, 1895.

"*Messers. Mabray, Oldham & Co., Bonham, Tex.*

"DEAR SIRS:—We are in receipt of your esteemed favor of the 29th inst. and note contents. The orders that you gave Mr. Price were cancelled some days ago, and we notified you promptly on receipt of them, to that effect. We are sorry that we can not accommodate you by filling them—we gave you our reasons for declining the orders, and must again respectfully state that we will not fill the orders taken by our salesman, Mr. Price—orders taken by our salesmen are always subject to our approval, always have been, and your demand is the first time that our right to decline an order has ever been questioned. Now, you can rest

assured that we do not desire any controversy with
you on the point, but at the same time we are fully
posted as to our rights, and while we should very much
regret any further controversy, we must again reaffirm
our previous letters to the effect that these orders were
respectfully declined, and that we should not ship the
goods.   With best regards we are,

<p style="text-align:center">"Yours truly,<br>
"KELLY-GOODFELLOW SHOE CO.<br>
"Per CHAS. H. HOKE."</p>

Some other correspondence was read in evidence
but of a character not necessary to be noticed here.

<p style="margin-left:2em"><span style="float:left">PRINCIPAL and<br>agent: liability<br>of principal for<br>contracts of sale<br>by agent: gen-<br>eral usage:<br>option of prin-<br>cipal to reject<br>sales.</span></p>

The bills of sale made and delivered by
Price to the plaintiffs are in form and
substance absolute bills of sale and are
binding upon the Kelly-Goodfellow Shoe
Company, if Price had the authority to
make them as their agent.   In *Turnbull
v. N. W. Terra Cotta*, 49 N. W. Rep. 229, it was said:
"An agent employed to solicit orders for goods must,
as to innocent third persons dealing with him, be
deemed to have authority to accept the orders, and to
enter into contracts of sale binding on his principal,
where that is the general *usage* in the business.   In
*Mills v. Berla*, 23 S. W. Rep., it was held that on the
question whether an agent had authority to make a
contract which was recognized by his principal, it may
be shown that he had made similar contracts before.
In *Franklin v. Ins. Co.*, 52 Mo. 461, it is said: "The
authority of an agent need not necessarily be proven
by an express contract of agency, but may be proved
by the habit and course of business of the principal."

In *Edwards v. Thomas*, 66 Mo. 468, it is said:
"The authority of the agent may be inferred from the
nature of the employment."   Mechem on Agency,

section 281, in speaking of the powers conferred by usage, says: "Where the principal confers upon his agent an authority of a kind, or empowers him to transact business of a nature, in reference to which there is a well defined and publicly known usage, it is the presumption of the law, in the absence of anything to indicate a contrary intent, that the authority was conferred in contemplation of the usage, and third persons, therefore, who deal with such agent in good faith and in the exercise of reasonable prudence, will be protected against limitations upon the usual authority, of which they had no notice." Citing numerous authorities in support of the text. In section 362 the same author says: "An agent, clothed with general power to sell personal property without restrictions, has implied authority to fix the price and to agree upon the terms of sale." And in *Austin v. Springer*, 54 Mich. 343, it is said: "The agent employed to solicit orders for goods must, as to innocent third persons dealing with him, be deemed to have authority to accept the orders, and enter into contracts of sale binding on his principal, where that is the general usage in the business as conducted by such manufacturers and other such agents. And especially where it is shown that such like sales previously entered into by the agent in question had been recognized by his employers." The authority of Price as the agent of defendant to make the sales in question was shown by the general custom of the trade of St. Louis wholesale dealers with their Texas customers, and also by a previous and uniform course of dealing recognized and acted upon by the defendant with the plaintiffs and with other Texas customers. But it is contended that because the custom showed the right of the wholesale dealer to reject the order on account of the unsatisfactory commercial standing of the buyer, there could be no complete sale

until the wholesale dealer had received and accepted the order; that a right to reject the order for one reason, gave the right to reject without any reason. We do not so understand the law. Assuming, as the evidence shows to be the fact, that the Kelly-Goodfellow Shoe Company had the right to reject the sales made to plaintiffs by Price should the commercial standing of plaintiffs be unsatisfactory to it, this right was tantamount to a right to exercise an option on its part to accept or reject the Bonham and McKinney firms as its debtors, and like any other option entering into a contract to be available and effectual, must be exercised in a reasonable time. 1 Parsons on Contracts, sec. 539; *Farlow v. Ellis*, 15 Gray, 229. This option was not exercised by the defendant, and according to the evidence the contracts of sale became absolute. *Sneed v. Lard*, 66 Me. 580; *Stone v. Perry*, 60 Me. 48; *Whitney v. Eaton*, 15 Gray, 225. The evidence tended to prove the allegations in plaintiff's petition, and the issues should have been submitted to the jury under proper instructions. The judgment is reversed with directions to the circuit court to sustain plaintiffs' motion to set aside the nonsuit and to grant them a new trial. Judge BOND concurs; Judge BIGGS dissents.

BIGGS, J. (*dissenting*).—It seems to me that the discussion in the opinion of my associates is apart from the evidence in the case. We have no concern with the general rule of law as to the express or implied authority of agents. The authority of Price was fixed by custom or usage of trade. It is only for us to determine what the custom was and its legal effect. The plaintiffs' evidence tended to prove that under a general custom which prevailed in the state of Texas, traveling salesmen for St. Louis houses had authority to fix the price of the goods and the terms of the sale; that in the

exercise of this authority they could fix a price for something less than the list or market price and extend the usual time of credit, but the right to reject orders was reserved to their principals when the financial standing or rating of the proposed purchaser was not satisfactory to them. The theory of the circuit court evidently was, that under this custom Price had authority only to solicit orders for the sale of goods. To this I agree. The contention of the appellants is that Price had authority to bind the defendant as to price and terms, and that the only power reserved by the defendant was to reject an order if the financial standing of the purchaser was not good. Hence it is insisted that as the refusal of the defendant to ship the goods to the appellants was put on other and different grounds, the contract became enforcible against the defendant. To this conclusion I can not agree. Some of the cases cited by the appellants decide in a general way that *prima facie* a commercial traveler is to be regarded by the business world as a general agent with power to bind his principal as to prices and as to the length of the credit. Under certain limitations I agree to this; that is, the price must be according to the list or market price, and the time of payment must be according to the usage of the trade; or if the custom or usage of trade allow the salesman to cut the list price, or extend the usual time of credit, then the cut must be reasonable and the extension must likewise be reasonable. Some of the cases go so far as to hold that a traveling salesman, in the absence of restrictions which are known to the customer, has authority to bind his principal absolutely, unless the transaction is shown to be fraudulent.

This question, however, is an immaterial one, as I have already stated, since all the evidence introduced by plaintiffs tended to prove that according to the usage

of the trade in Texas the defendant had the right to repudiate the plaintiffs' order if their financial standing was not satisfactory to it, thus definitely and affirmatively fixing a limitation on Price's authority. The question then is, how did this reserved power of the defendant affect Price's dealings with others? The substance of the plaintiffs' evidence is that the defendant had the unqualified right or option to disapprove of plaintiffs' order if the financial rating or standing of the plaintiffs was not satisfactory to it. The legal effect of this evidence is that the defendant could exercise this option either with or without reason. This is the only reasonable construction, for it would be unreasonable in the extreme to hold that a wholesale merchant must, under any circumstances, justify his action in refusing to sell his goods on credit. Therefore if the defendant had an unqualified right to repudiate the transaction, how can it be said that there was a contract until it had either expressly or tacitly manifested an intention to ratify Price's act. On principle there can be no contract as to the party who has the unqualified right to withdraw from the negotiations so long as such right of withdrawal remains. This seems to me to be fundamental law. The fact that the defendant in the first instance put its refusal to fill the order on the grounds that the salesman had priced the goods below the market and that he had extended the time of the usual credit, in nowise affects the merits of the question. The point is, that there was no contract until the defendant signified an intention to be bound. This it did not do, but promptly repudiated the action of its agent. The reasons assigned for its action seem to me to be immaterial. The question is, could the defendant refuse to be bound for any reason? I agree with my associates that the right or option of the defendant to reject the order must have

been exercised promptly, for otherwise the inference might be drawn that the order had been approved. The principle, however, is not applicable here, for the evidence shows that the defendant notified the plaintiffs by return mail that it would not fill the order as made. As before stated, it is immaterial upon what grounds the defendant based its refusal to make the sale.

The practical result of the foregoing discussion is to make Price a solicitor of orders for the sale of goods, subject to the approval of the defendant. It is true that in naming prices and the time of credit he was not bound by an ironclad rule. This discretionary power could only have become material if the defendant had in any manner signified an intention to ratify plaintiffs' order.

In such a case the defendant would have been bound, although it was not actually advised that its salesman had priced the goods below their market value and had extended the customary time of payment. It would be conclusively presumed that in making the ratification the defendant had in mind this discretionary power on the part of Price. For the foregoing reasons I must dissent from the conclusion reached by a majority of the court.