CARY M. KEYS et al., Appellants, v. ESTATE OF CARY M. KEYS, Jr.; GEORGE R. HENDERSON, Administrator *ad litem.*

### Division One, February 25, 1909.

1. **ADMINISTRATION: Filing Claim: Sunday Last Day.** Where the last day for filing a claim against an estate of decedent falls on Sunday, the claimants, under the statute, have all of the following Monday in which to file it.

2. ————: ————: ————: **Action of Court.** If a claim is filed within the statutory time with the probate court, it can make no difference as to the timeliness of the filing when the court acted upon it.

3. ————: ————: ————: **Presentation.** A filing of a claim with the clerk is a presentation of it to the court. The word "presentation" as used in the statute does not mean that there should be an actual presentation of the claim to the judge and a hearing thereon. If the claim against decedent's estate is actually lodged with the court, through the file mark of the clerk or otherwise, there is a sufficient presentation to meet the requirements of the law. [Disapproving, on this point, majority opinion in Savings Bank v. Burgin, 73 Mo. App. 108.]

4. **INVALID CAUSE OF ACTION: Indorsement of Notes: Suit on Account.** A commission firm would advance to a partnership dealing in cattle, upon draft or otherwise, moneys for the conduct of its business. These advances would be taken up by notes of the partnership, with chattel mortgages on cattle then owned by it. The notes were indorsed by the commission firm and sold to banks or other parties, and if at maturity they were not paid by the partnership they were taken up by the indorsers, and when so taken up the amounts thus paid were placed by the indorsers (the commission firm) as a debt on an account run between the firms, and the commission firm sues the estate of a deceased one of the partners for the balance shown by that account to be due. *Held,* that the suit cannot be maintained. The commission firm paid the notes as indorsers and their right to sue is as indorsers, and their suit should have been brought on the notes, and not upon an account.

5. ————: ————: ————: **Indorser's Suit.** The indorser of notes, who pays the amounts thereof when they become due, cannot sue the makers upon an account, but he must sue on the notes themselves thus redeemed by him.

6. ————: ————: **Difference Between Indorser and Surety.**
There is a vast difference between an indorser and surety in
respect of their right to recover the amount paid by either
upon the note. When the surety pays the note a cause of action
arises in his favor against the maker for the amount so paid,
and he can sue upon the maker's implied promise to repay
what he has paid for him. But not so the indorser. There is
no contract, express or implied, between him and the maker
that the indorser will pay any sum upon the maker's obliga-
tion. The indorser's only contract is an independent one, by
the terms of which the maker is not bound, namely, that if
the maker does not pay the amount of the note, the indorser
will; and if he does so pay, he is entitled to have back the
note, which is his evidence of debt against the maker, but no
more.

7. ————: ————: **Note: Payment of Original Debt: Additional
Security.** The mere giving of a note may not extinguish the
original debt, but a note and chattel mortgage given for the
amount of the debt evince the intention of a payment of the
debt by a note and mortgage, the additional consideration being
the security.

Appeal from St. Louis City Circuit Court.—*Hon.
Walter B. Douglas,* Judge.

AFFIRMED.

*R. M. Nichols* for appellants.

(1) The taking of the notes, executed by Fields
& Keys, Jr., for the money advanced by C. M. Keys
& Co. did not extinguish the original cause of action,
but only suspended the right of action during the time
of the running of the note or notes, and after the
maturity of the same, if not paid, an action can be
maintained on the original cause of action, upon sur-
render of the note, if in the possession of C. M. Keys
& Co., or accounting for its absence. Steamboat Char-
lotte v. Hammond, 9 Mo. 59; Appleton v. Kennon, 19
Mo. 637; Bank v. Leavitt, 65 Mo. 562; Leabo v. Goode,
67 Mo. 126; Reyburn v. Mitchell, 106 Mo. 365; Bertiaux
v. Dillon, 20 Mo. App. 603; Bank v. Peterman, 21 Mo.

217 Sup—4

App. 512; Selby v. McCullough, 26 Mo. App. 66; Flynt
v. Railroad, 38 Mo. App. 94; Shotwell v. Monroe, 42
Mo. App. 677; Crider v. Wagner, 47 Mo. App. 438;
Barton Bros. v. Hunter, 59 Mo. App. 618. (2) The
testimony conclusively shows that the notes were
brought to the court for the purposes of the trial of
the case and were in court the day upon which the
order of reference was made; that thereafter they
could not be found, for the purpose of making a tend-
der, or having them cancelled. This is all the law
would require, or that claimants could do, in order to
maintain their suit upon the original consideration.
Steamboat Charlotte v. Lumm, 9 Mo. 64; Lord v.
Koenig, 7 Mo. App. 454; McMurray v. Taylor, 30 Mo.
266; Ashdown v. Wood, 31 Mo. 465. (3) The accept-
ance by C. M. Keys & Co. of a note of an individual
member of the firm of Fields & Keys, Jr., dissolved
by the death of Keys, in lieu of the matured note of
the firm, is not an extinguishment of the firm debt,
unless expressly agreed that it should so operate.
Deabo v. Good, 67 Mo. 126. (4) The payment of the
notes by the claimant had the effect to extinguish
them, and the law raised an implied promise in favor
of the claimant, against the said estate, for the amount
so paid by claimant, which was recoverable in an ac-
tion at law. Bauer v. Gray, 18 Mo. App. 164; Williams
v. Gerber, 75 Mo. App. 30; Burton v. Rutherford,
Admr., 49 Mo. 258; Blake v. Downey, 51 Mo. 438;
Halliburton v. Carter, 55 Mo. 439; Hearne v. Keath,
63 Mo. 89; Burckhartt v. Helfrich, 77 Mo. 382; 2
Woerner's Am. S. of Admins., *p. 1243; Whisley v.
Bragg, 31 Mo. 124; Mansfield v. Edwards, 135 Mass.
15. (5) When C. M. Keys, Jr., died, by virtue of
the right of survivorship existing between him and
his partner, the title to the partnership property
passed to and vested in B. F. Fields, as such surviv-
ing partner. 2 Bates on Partnership, sec. 417; Bender
v. Markle, 37 Mo. App. 234; Hargadine v. Gibbons,

45 Mo. App. 460, 114 Mo. 561; 22 Am. and Eng. Ency. Law, 211. (6) Letters of administration were granted on December 1, 1899, and publication thereof was made within thirty days, which started the running of the two-year Statute of Limitation from December 1, 1899. The proof showed that the account was exhibited to the administrator November 30, 1901, and filed in the probate court December 2, 1901—December 1, 1901, being Sunday—of which the court will take judicial notice. It is conceded that the claim was exhibited within two years. R. S. 1899, secs. 188, 566, 4160 (par. 4), 184 (par. 6); Nicholas Shepherd & Co. v. Donovan, 67 Mo. App. 289. (7) The expunging by the Legislature from the statute of the words "and presented to the court for allowance in two years" after the decisions in the case of Price v. McCause and Savings Bank v. Bergen, is evidence of an intention to change the law, and it has been held by the Supreme Court that the law was changed, and that the change did away with the necessity of actually trying the case and obtaining a judgment of allowance of the claim within two years. Ryans v. Boogher, 169 Mo. 673; Land Co. v. Wright, 114 Mo. 333; McGrath v. Railroad, 128 Mo. 1. (8) It was proper for the circuit court, upon appeal from the probate court, to allow the amendment of the account, constituting the cause of action, by transferring an item from the credit to the debit side of the ledger. Goddard v. Williamson's Adm., 72 Mo. 134; Hunt v. Bouton's Admr., 63 Mo. 188; Roeder v. Shryock, 61 Mo. App. 488. (9) "Amendments of the *ad damnum* are never deemed to constitute a new cause of action. Hence, the frequent ground of objection will not hold at any stage of the case against amendments increasing or reducing the amount of the demand." 1 Ency. Pl. and Pr., p. 586, sec. 10; Elliott v. Abel, 39 Mo. App. 346; McCallaham v. Smith, 76 Mo. 428; Lucas v. Fallon, 40 Mo. App. 551; Hixon v. Selders, 46 Mo. App. 275.

*Wm. F. Woerner* and *Rudolph Schulenburg* for respondent.

(1) The indebtedness of Fields and Keys, Jr., to C. M. Keys & Co. was evidenced by negotiable notes, which the latter indorsed and sold, afterwards taking up the notes because of their liability as indorsers. The claim, if any, is wholly upon notes or unpaid balances due thereon. The relation of an indorser, for value, of a note, to the note and maker thereof, is different from that of a surety on it. All the authorities cited by appellants on this point relate to suretyship, and are, therefore, not in point. The liability to which the indorser becomes subject by the indorsement arises wholly from his own act, and not at the instance of the maker, nor for his benefit. If the indorser has to pay, he simply gets back the note and the cause of action against the maker, which he has seen fit to transfer, but does not, like a surety, thereby acquire any implied cause of action for the money paid. Consequently, an indorser must maintain his claim upon the note itself, which he has reacquired, and not for the sum paid by him. Fenn v. Dugdale, 31 Mo. 582; Peers v. Kirkham, 46 Mo. 146. (2) Appellants cannot recover as if they had sued on the notes. (a) The statute expressly requires the claimant against an estate to set out in his notice of claim a copy of the instrument of writing upon which his claim is founded. No demand on any note was either exhibited to the administrator nor presented to the court for allowance. No claim based on notes is set out and no copy of any note upon which it could claim to be based is furnished or ever was given. It is plain that no judgment can be awarded claimants for any sum whatever upon the demand set out in their notice. R. S. 1899, secs. 188, 197; Fenn v. Dugdale, 31 Mo. 582; In re Sullenberger, 72 Cal. 549. (b) Even if it were permitted to change claimants' cause of

action from one on a long account (triable before a referee), to one on notes (triable before a jury), which we do not concede, yet appellants' contention of error on the part of the referee and court in not directing such amendment cannot be entertained. The claimants never at any time requested leave to so amend; they have always insisted, and still do, that the action was properly brought on account, and not on the notes, even pretending to have offered a surrender of the notes or its equivalent, so as to revive the original indebtedness. How, then, can appellants claim error because the referee and court did not volunteer to do what appellants never asked, and which they still say would have been error if done? (3) The claimants' demand, if any, was wholly upon notes or unpaid balances thereon. Claimants cannot sue upon an account after the same has been closed by the giving and acceptance of negotiable notes for the amount due, without first surrendering for cancellation said notes, or accounting for their non-production in such manner as to show an intention to cancel all liability thereon. The evidence upon the non-production of the notes was for a wholly different purpose; it fails to show any such surrender or intention. O'Bryan v. Jones, 38 Mo. App. 94; Schepflin v. Dessar, 20 Mo. App. 575; Steamboat v. Hammond, 9 Mo. 64.

GRAVES, J.—This cause originated in the probate court of the city of St. Louis. In that court the plaintiffs had judgment for nearly $11,000. From that judgment an appeal was taken to the circuit court, wherein Hon. Jno. W. Dryden was appointed as referee, and made a finding of facts as well as a statement of his conclusions of law. The referee recommended judgment for the defendant, and judgment was so entered by the court, after overruling the plaintiffs' exceptions to the report of the referee. From that judgment the plaintiffs appeal, and thus the case

is here. The referee in his report carefully stated the issues as well as his findings of fact. So carefully was this done that we shall use the same as the statement of this case. He says:

"THE ISSUES:

"The cause arose in the probate court of the city of St. Louis at its December term, 1901. This appears by the transcript from that court, filed in the St. Louis Circuit Court on February 2, 1902, upon an appeal taken from a judgment of that court rendered January 17, 1902, in the matter of the estate of one Cary M. Keys, Jr., deceased, allowing a demand against said estate in favor of C. M. Keys & Company (a firm composed of Cary M. Keys and Hugh Mills), as claimants in the sum of $10,992.22, taken by George R. Henderson, who had been appointed by that court to defend the estate in the matter of said demand. From the transcript, and the original papers transmitted therewith to the circuit court, it appears that the demand sought to be allowed was set out in a written notice thereof, given to Cary M. Keys as administrator of said estate of Cary M. Keys, Jr., on November 30, 1901, by Hugh Mills for himself and copartner, and filed in said probate court on Monday, December 2, 1901; also that on December 5, 1901, said probate court on its appearing that said Cary M. Keys, one of the claimants, was the administrator of said estate, appointed the said Henderson to represent and defend it in respect of said demand. It also appears from said papers that said demand was for a balance of $10,992.22 on an open account, in favor of said Cary M. Keys & Company against the firm of Fields & Keys, Jr., and set out in said notice. The account so set out therein was headed thus:

" 'Dr. Fields & Keys, Jr.

" 'In account with Cary M. Keys & Co. Cr.'
and consisted of 278 debit items of various debts be-

tween November 8, 1897, and November 25, 1901, and of 114 credit items of various dates in the same period. Said debit items were for various sums aggregating $507,439.15; and said credit items were for various amounts aggregating $496,446.93; and after deducting the aggregate of said credit items from that of said debit items, the account showed a balance of $10,992.22 in favor of claimants.

"The debit items in said account appeared to be, almost entirely, either charged for cash paid on drafts, or for the amount of notes, or interest or discounts; and the credit items therein appeared to be almost wholly credits for cash, the amounts of net sales of cattle, or of notes or bills receivable.

"It did not from anything stated in the account appear for, or to whom, the debit items of cash noted in it were paid, or whether they were paid at the request of the deceased or of Fields & Keys, Jr., or not, or by, or to, whom the notes named in it were made, or when they were so made.

"It appeared in the account that all the credit items in it up to and including February 28, 1900, aggregated the same acount as all the debit items to that day; also that all the credit items therein up to and including the 23d of October, 1901, were equal in amount to the total of all the debit items to that day, that is, to and including said 23d day of October, 1901.

"After the appeal taken in the cause to the circuit court, under authority of an order made herein on December 26, 1902, the account was amended by the claimants by their adding to the balance in their favor of ten thousand nine hundred and ninety-two and twenty-two hundredths dollars, shown thereby as originally filed, two further debit items under date of November 25, 1901, reading as follows:

" '1901:

> Nov. 25, To balance due on note No. 1,574, amended by order of court ...... ...............$ 9,931.47

" '1901:

> Nov. 25, To interest paid on note No. 1,574, amended by order of court .... ................   518.80
>
> Which two items being so added to said balance of.... 10,922.22

> Made the total balance claimed at the time of the hearing by me .... .... .............$21,442.49'

"FINDINGS OF FACTS.

"On and before November 7,. 1897, and up to the time of the presenting of the demand sued for herein for allowance, the claimants, Cary M. Keys and Hugh Mills, were copartners in trade under the name of Cary M. Keys & Company, engaged in the business of selling cattle on commission at the National Stock Yards in Illinois and elsewhere. From said November 7, 1897, and up to November 11, 1899, the decedent, Cary M. Keys, Jr., who was a son of the claimant, Cary M. Keys, was a resident of the Indian Territory, and was there engaged in the business of buying, feeding and forwarding for sale at the National Stock Yards and elsewhere divers sorts of cattle. He was, during said time, carrying on said business in partnership with one B. T. Fields under the name of Fields & Keys, Jr. On November 11, 1899, while still a resident of said Indian Territory, he died in said territory. No letters of administration upon his estate, or upon the partnership estate of the firm of Fields & Keys, Jr., were ever granted to any one in said Indian Territory, nor was there any administration of the partnership estate of said firm, either

by the surviving partner, or by any one else, in Missouri. On the first day of December, 1899, letters of administration of the estate of said Cary M. Keys, Jr., were granted by the probate court of the city of St. Louis to his father, the said claimant, Cary M. Keys; and he at once qualified and began the administration of said estate.

"Due notice of the grant of such letters was published by him within thirty days after their date, and on December 27, 1899, due proof that such publication had been made was filed by him as administrator in said court.

"Between November 7, 1897, and the death of said Cary M. Keys, Jr., the claimants paid to the use of him and his said firm of Fields & Keys, Jr., the amounts of sundry drafts drawn on them, some by said firm and some by himself. The total of the drafts so drawn on, and paid by them before decedent's death was $72,424.65 and the amounts thereof are included in the debit items of the account set out in their notice of demand. Said Fields & Keys, Jr., from time to time in the period mentioned, and before decedent's death, paid to the claimant divers sums on account of their indebtedness to them for the amounts of said drafts so paid, all of which appear as credits in the account. They also, from time to time in said period, made to claimants sundry promissory notes payable to their order in settlement of their said indebtedness for the moneys so paid by them for their use upon said drafts. The amounts of these notes are also included in the credit items of the account. Most of these notes so made by Fields & Keys, Jr., to claimant were secured by chattel mortgages executed by them to claimants, whereby they mortgaged to them divers quantities of cattle which had been bought by them and were in their possession in said Indian Territory. Claimants, after the receipt from them of said notes, sold and indorsed them to

the Continental National Bank of St. Louis, and others. Such of them as were not paid by Fields & Keys, Jr., were taken up by claimants at their maturity, they paying the amount thereof and interest accrued thereon to said bank, or other holders thereof and receiving them back from the holders. In an account that was kept by them with Fields & Keys, Jr., on their books, they charged the latter with the amounts of the principal and interest of said notes so paid by them to said bank, or other holders, from time to time, and the amounts of their said payments form part of the debit items in the account set out in their notice of demand.

"For part of the notes so sold and indorsed and afterwards taken up at their maturity by claimants, said Fields & Keys, Jr., executed to them new notes payable, in like manner, to their order for the amounts of the principal, and interest therein, in renewal thereof. These the claimants, in like manner, again sold and indorsed to said bank and others, and upon their not being paid by their makers when due, again took up by paying to the holders of them the amount of the principal and interest thereof; and they also in like manner, charged said Fields & Keys, Jr., in the account on their books for the amounts they had so paid for the principal and interest thereof. The total amount paid by them in so taking up said several notes, whether originals or renewals, for the principal and the interest thereof, in the period between November 7, 1897, and decedent's death on November 11, 1899, was $140,667.84. The several amounts so paid by them for same form part of the debit items of their said account set out in their notice of demand.

"Of the said notes that had been thus made to claimants by Fields and Keys, Jr., prior to decedent's death, there were remaining still outstanding and unpaid at the time of his death on November 11, 1899, thirteen, of which the principal aggregated $69,779.36.

These were respectively of dates and for amounts as follows, viz.:

Oct.  22, 1898, for $ 1,000.00
May  15, 1899, for  11,433.40
May  16, 1899, for   2,029.16
May  16, 1899, for   2,087.51
July 24, 1899, for   5,500.00
Aug.  7, 1899, for   6,229.29
Sept. 25, 1899, for   4,500.00
Sept. 25, 1899, for   4,500.00
Oct.  9, 1899, for  12,000.00
Oct. 18, 1899, for  14,000.00
Oct. 30, 1899, for   1,000.00
Oct. 30, 1899, for   2,500.00
Nov. 11, 1899, for   3,000.00

Total:  $69,779.36

"Of these unpaid notes so then remaining unpaid all except those dated October 22, 1898, for $1,000.00; May 16, 1899, for $2,087.51; October 30, 1899, for $1,000.00; and October 30, 1899, for $2,500, respectively, were secured by chattel mortgages made by said Fields & Keys on various quantities of cattle, aggregating in all 2,832 head of cattle.

"After the death of said decedent, the surviving partner of his said firm of Fields & Keys, Jr., viz., B. T. Fields, continued from time to time up to November 25, 1901, to draw drafts upon claimants for various amounts of money on account of the said firm, then dissolved by decedent's death, and claimants in said period paid for account of him as such surviving partner sundry ones thereof, and charged the amounts paid by them therefor against said dissolved firm in its account with them on their books. The total of the sums so paid and charged by them after decedent's death, was $10,118, and the various sums so paid aggregating that amount are included in the

debit items of said account set out in the claimants' notice of demand.

"After decedent's death, said Fields also executed to claimants divers promissory notes payable to their order in the name of the former firm of Fields & Keys, Jr. Of these, some were in settlement of his indebtedness for the amounts paid by claimants on the drafts so drawn on them by him after decedent's death; some were in renewal or settlement of the amounts of said notes aggregating $69,779.36, and interest thereon, which had been taken up by them, some before and some after decedent's death and were remaining unpaid when he died; and others were in like renewal from time to time up to November 25, 1901, of said notes so given by him and taken up by them. The amounts of all of said notes so made by said Fields after decedent's death were credited to the former firm of Fields & Keys, Jr., on their books and formed part of the credit items set out in their notice of demand.

"After decedent's death, claimants, as before, sold and indorsed to said Continental National Bank and other banks or persons, all of the various notes so made by said Fields to them, and, on the coming due of any of them, or any of those which had been made by said firm before his death, and which were then remaining unpaid, took them up, and paid to said bank, or other holders thereof, the balance of principal and interest thereon then unpaid, and received them back from said bank, or other holders. They also, in like manner, charged the amount so paid by them of principal and interest of all of said notes so taken up by them against said firm of Fields & Keys, Jr., in their account with them on their books; and the various amounts so paid are included in the debit items of the account set out in claimants' said notice of demand. The aggregate of the amounts so paid by them for principal and interest of said notes

taken up by them after decedent's death, and up to
the 30th of November, 1901, was $272,756.

"Between the 8th day of November, 1897, and the
time of the filing in the probate court of claimants'
notice of their demand, they received from said firm
of Fields & Keys, Jr., before decedent's death, and
from said Fields as surviving partner after his death,
sundry lots of the cattle specified in the chattel mort-
gages securing divers of the notes hereinabove men-
tioned, for sale by them for account of said firm of
Fields & Keys, Jr., and made sales thereof and re-
ceived in cash the net proceeds of such sales. The
amounts so received were credited by them to said
firm of Fields & Keys, Jr., in their account with them
on their books, and are all included in the credit items
of said account set out in their said notice of demand.
They aggregate the sum of $71,772.72.

"Besides the amounts hereinabove found to have
been paid by claimants to said Continental National
Bank, or other holders of the various notes above
mentioned, on account of the principal and interest of
same, when taken up by them, and to have been in-
cluded in the debit items of the account set out in
their notice of demand, there were paid by them to
said bank, or other holders, one of said notes before
their presentment of their demand for allowance in
the probate court certain sums which were not in-
cluded in the debit items of said account. Among said
notes was one of date the 15th day of April, 1901,
for the sum of $17,010.09 and designated in the ac-
count as note No. 1,574. This was one of those which
were made by said Fields as surviving partner after
decedent's death as above found, and was so made by
him in renewal to the extent of $16,500, of two notes
amounting to that sum which had been made by the
firm of Fields & Keys, Jr., in May, 1899, before de-
cedent's death. Claimants on October 23, 1901, paid to
the holder of said note, No. 1,574, the sum of $4,473.60,

and on October 30, 1901, the further sum of .$2,605.02 on account of the principal thereof. These two payments they charged against said former firm of Fields & Keys, Jr., in their said account under said dates and the same are a part of the total amount of $272,756 above found to have been paid by them on account of said notes so taken up by them after decedent's death. They also, on November 25, 1901, paid to the holder of said note the residue of the principal thereof, viz., $9,931.47 and all unpaid interest thereon to that time, namely, $518.80, or in all $10,450.27, and received said note back from such holder and had the same in their possession at the time of the hearing before me. Said amounts so then, on November 25th, paid by them were not included in the debit items of the account set out in their notice of demand as filed in the probate court, but are the ones that were entered thereon on December 26, 1902, in the amendment of said account then made by virtue of the order of this court then made therein.

"None of the notes mentioned in the account set out in claimants' notice of their demand were produced at the hearing before me, nor was there any offer then made by them there to surrender any of them to the decedent's estate or to said Henderson, the defendant.

"On November 30, 1901, the claimant Mills delivered to his copartner, the claimant Cary M. Keys, as administrator of decedent's estate, the notice of a demand claimed by him and said Keys as copartners under the name of C. M. Keys & Company hereinabove referred to. This was signed by said Mills with the names of himself and said Cary M. Keys and was verified by his oath stating that the claimants had given credit to the estate of the decedent for all claims and offsets to which it was entitled, and that the balance claimed was justly due. It was stated in it that the claimants would, at the next term of the probate.

court, to be holden at the court house in the city of St. Louis on Monday, the 2d day of December, 1901, or as soon thereafter as they could be heard, present for allowance against the estate of C. M. Keys, Jr., deceased, claims founded on an open account showing a balance of $10,992.22 of which account a copy followed. And there was then set out in it the copy of an account showing such balance of $10,992.22 in favor of claimants, all as already hereinabove specified. Below the affidavit of said Mills to the notice was written a statement signed by said Keys as administrator, in which it was stated that he acknowledged that the foregoing claim and account had been exhibited to him for allowance against the estate of C. M. Keys, Jr., deceased, on the 30th day of November, 1901, and that he thereby entered his appearance in the matter of said claim to the December term, 1901, of said probate court. On the second day of December, 1901, which was Monday and the first day of said December term, the claimants appeared in court, and filed therein said written notice of their claim, so exhibited to said administrator on the preceding Saturday, the 30th of November. Nothing more was done at that time with the notice of claim than to place it on file in the court, and to have it marked by the clerk thereof as filed; nor was any action taken thereon by the court until the following Thursday, the 5th day of December, 1901. On that day upon it appearing to the court that the administrator of decedent's estate was himself one of the claimants, an order was made by the court appointing George R. Henderson to represent and defend the estate as to said claim, and that he be notified of his appointment.''

The points made in the exceptions and in the briefs here will be noted in the course of the opinion.

I. Counsel seem to agree, in the briefs, that the suit was instituted in time to obviate the bar of the special statute of limitations.

Under our statute, Revised Statutes 1899, section 4160, the last day for filing the claim having fallen upon Sunday, the claimants had all of the following Monday in which to file it. Upon this point BLAND, P. J., in Jordan v. Railroad, 92 Mo. App. l. c. 85, has well said: "In Patrick v. Faulke, 45 Mo. 312, the Supreme Court construed section 4160, supra, to mean that if the last day in which an act might be done fell on Sunday, the act should be done not later then the preceding Saturday. This ruling, however, was virtually overturned by the subsequent case of Bank v. Williams, 46 Mo. 17, where the statute was construed to mean that if the last day for the performance of an act fell on Sunday, Sunday should be excluded from the computation of the time in which it might be done and that the act might be done on the succeeding Monday. Bank v. Williams has been approved and followed in Cattell v. The Dispatch Publishing Company, 88 Mo. 356; State v. Harris, 121 Mo. l. c. 447; Maloney v. Railroad, 122 Mo. l. c. 115; State v. May, 142 Mo. 135; and in Evans & Hollinger v. Railroad, 76 Mo. App. 468."

This was a case where the question arose as to whether or not a writ of error had been sued out in time. The year expired February 9, 1902, which was Sunday. The writ was sued out the next day. Motion to dismiss the writ was overruled and we think properly.

From the findings of fact it appears that the notice of claim was served upon the administrator November 30th, but the claim itself was not filed with the court until Monday, December 2, 1901. If we exclude Sunday, as we should, as above indicated, this filing was in time. No action was taken by the court for several days thereafter, but the notice was to

the effect that the claim would be filed on December 2, 1901, and it was so filed.

If the claim was filed in the court within the time, it can make no difference as to when the court acted thereon. Claimants can not always regulate the actions of courts, and all they have to do is to present their claims within the statutory period of limitations. Nor does "presentation" as used in the statute mean that there should be an actual presentation to the judge and a hearing thereon, but if the claim is actually lodged with the court, through the file mark of its clerk, or otherwise, such is a sufficient presentation to meet the requirements of the law, although the judge of the court may not act thereon for days thereafter. The filing with the clerk is a presentation of the claim to the court. We concur in the language of ELLISON, J., in his separate concurring opinion in Savings Bank v. Burgin, 73 Mo. App. l. c. 116, wherein he says: "I agree that a claim must be both exhibited to the administrator and presented to the probate court for allowance within the two years prescribed as a limitation. But I believe when a claim has been duly exhibited to the administrator and then, within the period of limitation, is filed in the probate court, it becomes a part of the records of such court and is presented to the court in the sense of the statute. Formerly the running of limitation was arrested by merely exhibiting the demand to the administrator. It could then be held out of court by the claimant for a period beyond the limitation, thus often prolonging and embarrassing the administration. To cure this, the Legislature has required that the claim must be both exhibited and presented, so that it may be duly determined according to law and the practice of the court. This is accomplished by exhibiting the claim to the administrator and filing it in court on or before the next term, that it may be determined in regular course.

217 Sup—5

The words 'presented to the court for allowance' do not mean that the cause must be heard by the court within the two years as contended by the appellant. The hearing may, of course, be continued by the court according to its procedure and practice. Those words mean that the claim must be deposited in court, whether in vacation or.term time, to the end that it may be proceeded with at the next term according to law and not held back indefinitely by the claimant.'' The majority opinion in that case says: ''The claimant, according to the statute, is required to present his demand to the court and not to the clerk.'' In that the opinion goes too far. When the claim is lodged with and filed by the clerk of the court, it should be considered as presented to the court. In the case at bar the notice was that it would be presented at the next term of the court on December 2, 1901, and on that day the claim was filed and marked filed. This was sufficient.

II. From the finding of facts, concerning which there is no very serious controversy, it appears that if we take from the debit side of the account filed, those sums which have been charged in the account, as moneys paid for taking up certain notes with accrued interest, given by Fields & Keys, Jr., to C. M. Keys & Co., then there should be no judgment for plaintiffs.

From the findings of fact, which are thoroughly sustained by the evidence, it appears that C. M. Keys & Co. would advance to Fields & Keys, Jr., upon draft or otherwise, moneys for the conduct of their business. In many instances these advances would be taken up by notes of Fields & Keys, Jr., with chattel mortgages upon cattle then owned by them. These notes would be sold by C. M. Keys & Co. to the Continental National Bank or other parties, and indorsed by C. M. Keys & Co., and if at maturity they were

not paid by the makers, Fields & Keys, Jr., they were taken up by the indorsers, C. M. Keys & Co., and when so taken up they were placed, or the amounts thus paid were placed, in an account which was run between the firms. If these matters were proper matters of account then the plaintiffs have some standing; but if, as the referee found, these notes when taken up by the indorsers were the sole evidence of the debt between the two firms, then this suit must fail. These notes were given for actual cash borrowed. They were sold to the Continental National Bank and other parties. Upon maturity, if not paid by the makers, they were taken up by the indorsers, so that we have the clean-cut question, as to whether or not an indorser upon a note can pay the amount thereof and then sue the makers upon an account, or whether his right of action is upon the note thus redeemed by him or them. The solution of this question solves this case.

The relation of C. M. Keys & Co. to these notes is that of an indorser, and if, as the referee rightly found, there is sufficient number of these items on the debit side of the account filed to overbalance the judgment claimed, whether under the original or amended statement, then the judgment should be for defendant, unless the plaintiffs can sue upon the account, rather than upon these redeemed notes.

To our mind the referee reached the right conclusion of law when he held that the action, if any, was upon the notes, rather than upon the account. Remembering that the claimants took notes for their debt, and then sold them by indorsement, and afterwards paid their vendee the amount of the note, and took up the same, it is clear that, as against the makers, their action is upon the note and not upon the account. In Fenn v. Dugdale, Admx., 31 Mo. l. c. 582, we said: "The liability of the defendant to the plaintiff is upon the note, and is not caused by a payment for

the use or at the request of the defendant. Fenn's payment to Lucas & Co. was in satisfaction of his own liability as indorser, and not for or on account of the maker of the note; consequently, his demand against Dugdale is not for the sum paid by him, but for the amount of the note which he has reacquired of Lucas & Co. by satisfying them upon his contract created by his indorsement of the note. Fenn's demand against the estate of Dugdale should have been set out in his notice to the administratrix, as founded upon the note, and, as that was not done, objection was properly taken to admission in evidence of the note.''

And in the later case of Peers v. Kirkham, 46 Mo. l. c. 147, we said: ''It is impossible to distinguish this case from that of Fenn v. Dugdale, 31 Mo. 580. It was there held that the indorser of a promissory note could not recover against the maker the costs of the judgment recovered against him as indorser; that the judgment against the indorser was not evidence against the maker of the note; and that, where the indorser had satisfied a judgment upon the note against himself, his claim upon the maker was upon the note itself, and not for money paid. The case of Fenn v. Dugdale being regarded as decisive authority here, the judgment must be affirmed.''

C. M. Keys & Co., having adjusted the whole or any part of their indebtedness owing from Fields & Keys, Jr., by notes, and having sold these notes, upon the payment to their grantees of the face value and interest, did so as indorsers, and when so paid their action against the makers was one upon the notes and not one upon account. There is a vast difference between an indorser and a surety in this respect. With the surety, when payment is made by him, a cause of action arises for the amount so paid and he can sue upon the implied promise to repay what he has been out. Different, however, with an indorser of a note.

There is no contract either express or implied with him and the maker that he will pay any sum upon the obligation to another. The only contract is that the maker will pay to the payee the amount of the note as per its terms. In other words, the contract of indorsement is an independent contract, by the terms of which the maker of a note is not bound. If the payee of a note chose to indorse the note, and thus enter into this independent contract, which in law is to the effect that he will pay the amount of the note if the maker does not, and he does so pay such amount, he is entitled to have back from his grantee the note, which is his evidence of debt against the maker, but no more. In other words, he is left just where he was before he made the contract on his own responsibility,—the contract of indorsement. The two cases above cited have not been overruled nor criticised, nor should they be overruled. When the indorser pays the amount of a note to his indorsee, he does so upon the independent contract of indorsement, and thus reacquires the note which he had sold.

It is not necessary to discuss those cases wherein it is held that the giving of a note does not extinguish the original debt. Upon these cases the appellants rely. Grant that to be true, in cases wherein no security is given for the debt, but in cases wherein the original debt is merged into a note and chattel mortgage, as in the case at bar, there is certainly evinced the intention of a payment of the original debt by the note and mortgage. If I owe B a book account for $600 and later, being pressed by B, give him my note and chattel mortgage for said sum, the presumption follows that the old obligation is paid and the new one assumed. The additional security is ample consideration for the new contract, the note. We can see a difference between a case where additional security is given, and one where a simple note is given to take up an account. In the latter there would be no con

sideration for the change of the nature of the obliga-
tion, whilst in the former there would be ample con-
sideration. Nor does it appear that there was a sur-
render of the notes in question, or a tender of them.

In the case at bar the notice of claim and the
claim was not upon notes, but upon an account. Un-
der the law if the claim is upon a note, a copy thereof
must be stated and such was not stated in this case.
So that we have a plain claim upon an account, whilst
under the law it should have been upon notes.

In our judgment the legal conclusions of the ref-
eree were right, and there was no error upon the part
of the circuit court in entering judgment upon the re-
port.

III. From the record it appears that the plain-
tiffs continued business with Fields long after the
death, and thereby the dissolution of the copartner-
ship. Several nice questions are involved herein, but
in view of our conclusions upon the question in the
previous proposition further space need not be taken.

From all it follows that the case should be af-
firmed, and it is so ordered.

All concur.